

**ORDERED in the Southern District of Florida on March 16, 2007.**

**Paul G. Hyman, Chief Judge**
**United States Bankruptcy Court**

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

IN RE:                              CHAPTER 7

MARK ANDREW HENEBURY and            CASE NO. 06-13354-BKC-PGH
YVETTE JOAN HENEBURY
     Debtors.
_____/

<u>**ORDER DISMISSING CHAPTER 7 CASE UNLESS DEBTORS MOVE TO CONVERT TO**</u>
<u>**CHAPTER 13 WITHIN TEN DAYS OF ENTRY OF THIS ORDER**</u>

**THIS MATTER** came before the Court for evidentiary hearing on January 25, 2007 upon the United States Trustee's ("UST") *Amended Motion to Dismiss Case Pursuant to 11 U.S.C. § 707(b)(1) & (b)(3)* ("Motion") filed on November 17, 2006. On December 19, 2006, Debtors filed a *Response to UST's [Motion]*.

<u>**BACKGROUND**</u>

Mark Andrew Henebury ("Mr. Henebury") and Yvette Joan Henebury ("Mrs. Henebury")(collectively, "Debtors") filed a joint petition for Chapter 7 bankruptcy relief on July 21, 2006. Debtors are married and have three minor children. The Debtors moved to Florida

from Massachusetts in May 2005. Contemporaneously with the filing of their petition, Debtors filed their Schedules, Statement of Financial Affairs, and Official Form B22A: Statement of Current Monthly Income and Means Test Calculation ("Means Test"). The Debtors' Means Test shows annualized Current Monthly Income ("CMI") in the amount of $96,768.24 which is above the median income for a family of five residing in Florida[1]. Debtors' Means Test indicates that Debtors had negative monthly disposable income of $1,128.07 after calculating deductions to CMI. Thus, although the Means Test shows that Debtors had above median income, a presumption of abuse did not arise pursuant to 11 U.S.C. § 707(b)(2).

The Debtors' Schedules show that as of the petition date, the Debtors owned real property located in Lake Worth, Florida valued at $295,000.00 ("Lake Worth Property") with a mortgage of approximately $233,237.81. Debtors claimed that the Lake Worth Property was exempt as their homestead.  However at trial, Mr. Henebury testified that the family no longer resides at the Lake Worth Property, and that the family now resides in Port Orange near Daytona Beach, Florida.[2]  Mr. Henebury testified that he has not

---

[1]At the time of filing, the applicable median income for a family of five residing in Florida was $68,125.00.

[2]A Notice of Change of Address filed September 28, 2006 indicated Debtors' address as 300 N. Atlantic Ave., Daytona Beach. A subsequent Notice of Change of Address filed October 11, 2006 shows Debtors' current address as 5338 Plantation Home Way, Port Orange, Florida.

made mortgage payments on the Lake Worth Property since June 2006.[3] Mr. Henebury further testified that the Debtors hoped to keep the home "and sell it and obviously use the proceeds to buy another home."

Mr. Henebury also testified that he had not been happy with his job since it was not in the hotel industry in which he had pursued his career. Subsequently when a job in the hotel industry opened in Daytona Beach, he applied and obtained the job. Mr Henebury currently is, and as of the petition date was, employed as an engineer for Fairfield Resorts in Daytona Beach earning an annual salary of $85,000.00.

Debtors provided the UST with revised Schedules I and J on November 7, 2006 ("Proposed Revised Schedules")(Debtor Ex. 2; UST Ex. F). The Proposed Revised Schedules were not filed with the Court. However they show that the Port Orange residence where the family now resides is rented at a cost of $1,550.00 per month.

In addition to the Lake Worth Property, the Debtors also scheduled a 0.4349% ownership interest in a Disney Vacations Development, Inc. timeshare ("Timeshare") with a listed value of

_____

[3]On August 16, 2006, secured creditor GMAC filed a Motion for Relief from Stay respecting the Lake Worth Property alleging that the Lake Worth Property had been claimed as exempt but was not adequately protected. The Chapter 7 Trustee filed an Objection to GMAC's Motion for Relief from Stay on the basis that there existed non-exempt equity in the Lake Worth Property. On September 12, 2006 the Chapter 7 Trustee also filed an Objection to Debtors' Claim of Exemptions alleging that Debtors improperly claimed both federal and Massachusetts exemptions on their bankruptcy schedules. On September 26, 2006, prior to the hearing scheduled on the matter, GMAC withdrew its Motion for Relief from Stay. On November 2, 2006, the Chapter 7 Trustee withdrew her Objection to Debtors' Claim of Exemptions.

$15,000.00 that was secured by debt in the amount of $12,415.85. On November 30, 2006, Debtors signed a reaffirmation agreement for the Timeshare debt ("Reaffirmation Agreement"). The Reaffirmation Agreement was filed with the Court on December 21, 2006. The UST filed an Objection to the Reaffirmation Agreement. The Court heard the matter on December 27, 2006, and entered an Order Denying Reaffirmation Agreement on December 28, 2006.

Debtors' Schedule D also shows secured debt in the amount of $264.00 for a 1998 Subaru automobile valued at $1,200.00. Debtors listed no unsecured priority claims on Schedule E. Schedule F reflects unsecured nonpriority claims totaling $73,799.46. It is uncontested that essentially all of the debts are consumer/non-business debts.

Mrs. Henebury testified that she was unemployed prepetition because she needed to care for her five year old daughter who had undergone surgery in September 2005. However on Debtors' Schedule I, filed July 21, 2006, in answer to the line 17 directive to describe any increase or decrease in income reasonably anticipated to occur within the year postpetition, Debtors indicated: "Debtor wife will begin a teaching position on 7/25/06 for approximate wages of $39,000 per year." Mrs. Henebury testified that she indeed began working as a teacher at Spruce Creek High School in Port Orange the week after Debtors filed their petition. Debtors' Schedule I, as filed, lists only Mr. Henebury's gross monthly

4

income of $7,122.87 with his net monthly income as $4,836.88. Schedule J reflects total monthly expenses of $5,871.66. Included in these expenses are mortgage payments for the Lake Worth Property in the amount of $2,403.97, and monthly payments for the Timeshare in the amount of $252.56. Debtors' filed Schedules indicate that as of the petition date Debtors had negative monthly net income in the amount of $576.86.

The Proposed Revised Schedules, which were admitted into evidence but not filed with the Court, list Mrs. Henebury's monthly income as $3,401.66 with net monthly income of $2,875.00. The Proposed Revised Schedules list Debtors' combined net monthly income as $7,711.88. Proposed Revised Schedule J shows monthly expenses of $9,039.66. This expense amount represents an increase of $3,168.00 over the monthly expenses listed in Debtors' Schedule J which was filed on the petition date. Part of the increased expense reflected on Debtors' Proposed Schedule J is due to Debtors' listing expenses for both the Port Orange rental home where the family resides, and the Lake Worth Property where they do not reside and for which they stopped paying the mortgage prior to filing for bankruptcy. The Proposed Revised Schedules indicate that Debtors had negative monthly net income of $1,327.78.

At the January 25, 2007 hearing, Debtors introduced Exhibit 3 which was a second revised Schedule J dated November 30, 2006, that had not been previously filed with the Court ("Second Revised

Schedule J"). Second Revised Schedule J shows even further increased expenses for home maintenance, medical expenses, and recreation resulting in total monthly expenses of $10,207.66. However upon questioning, Debtors were unable to substantiate the increased expenses claimed with any documentary proof.

## CONCLUSIONS OF LAW

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §1334 (b). This is a core proceeding pursuant to 28 U.S.C. § 157 (b)(1) and (b)(2)(A) and (O).

### A. Procedural Posture and Arguments of the Parties

Debtors filed their petition on July 21, 2006 and therefore the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") governs this matter.

Interim Federal Rule of Bankruptcy Procedure 1017(e)(1) states in pertinent part that:

> a motion to dismiss a case for abuse under §707 (b) or (c) may be filed only within 60 days after the first date set for the meeting of creditors under § 341(a), unless, on request filed before the time has expired, the court for cause extends the time for filing the motion to dismiss. The party filing the motion shall set forth in the motion all matters to be considered at the hearing. A motion to dismiss under § 707(b)(1) and (3) shall state with particularity the circumstances alleged to constitute abuse.

Interim Bankr. R. 1017(e)(1)[4]

---

[4]Administrative Order 05-4 of the United States Bankruptcy Court for the Southern District of Florida adopted the Interim Rules of Bankruptcy Procedure effective October 17, 2005 for application in all cases filed on or after October 17, 2005 which are subject to BAPCPA.

The § 341 meeting of creditors in this case was held and concluded on August 18, 2006. Thus pursuant to Rule 1017(e)(1), the sixty day deadline to file a motion to dismiss pursuant to §707(b)(3) would have expired October 17, 2006. However on October 16, 2007, the UST timely filed an *Amended Agreed Ex-Parte Motion for Order for Extension of Time to File Motion to Dismiss Under 11 U.S.C. § 707(b)(3) and For Extension of Time to Object to Discharge Pursuant to 11 U.S.C. § 727* ("Motion for Extension of Time"). The Court entered the parties' *Agreed Order Granting UST's [Motion for Extension of Time]* which pursuant to the parties' agreement extended the deadlines for filing a motion to dismiss and a complaint objecting to discharge until November 20, 2006. The UST's Motion seeking dismissal was thus timely filed on November 17, 2006.

The UST's Motion argues with particularity that based upon the totality of circumstances of the Debtors' financial situation, the granting of relief to the Debtors in this case would be an abuse of the provisions of Chapter 7 pursuant to 11 U.S.C. § 707(b)(1) and (3). The UST further argues that the Debtors have the present ability to pay some, if not all, of their unsecured debts based upon Mrs. Henebury's employment as a teacher earning $39,000 per year and based upon the Debtors not making payments for among other things, the Lake Worth Property mortgage and the Timeshare debt. Finally, the UST argues that Debtors' other expenses are

7

overstated.

Debtors' counsel argues that a debtor's ability to pay standing alone is insufficient cause for dismissal pursuant to §707(b)(3)(B) which looks to the totality of the circumstances of debtor's financial situation to determine if the granting of Chapter 7 relief would be an abuse. Debtors' counsel further argues that Debtors have no ability to pay creditors because their expenses exceed their income.[5]

In the Court's view, the arguments of counsel raise questions of "what" and "when". First, under BAPCPA what is meant by the totality of the circumstances of the Debtors' financial situation. Second, are post petition events relevant to the determination of whether the granting of relief would be an abuse of the provisions of Chapter 7 based upon the totality of the circumstances of the Debtors' financial situation, when - as in this case - the circumstances of the Debtors' financial situation change over time. Both of these questions require a study of 11 U.S.C. § 707(b) as it has been reconstructed under BAPCPA.

---

[5] Debtors' Response framed the issue as: "When Debtors are uncertain of their ability to pay contractually due payments in the future on secured properties, are those scheduled payments part of the Debtor's current monthly income for purposes of the 'means test' of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005?" The Court notes that this statement of the issue is not on point because the UST's Motion does not challenge Debtors' Means Test calculations. The UST's Motion relies on § 707 (b)(3), not § 707 (b)(2).

**B.    11 U.S.C. § 707(b)**

**1.    BAPCPA's Overhaul of 11 U.S.C. § 707(b)**

The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 extensively modified § 707(b) which previously provided for dismissal of a Chapter 7 case under circumstances of substantial abuse. The § 707(b) modifications - as the act's title announces - were intended to prevent perceived bankruptcy abuses by Chapter 7 debtors who have the ability to pay some, if not all, of their debts to creditors. *See e.g., In re Singletary*, 354 B.R. 455, 459 (Bankr. S.D. Tex. 2006)("The abuse that concerned Congress was debtors receiving a full discharge under Chapter 7 when they had regular income that could be used to repay some portion of their unsecured debt in a Chapter 13 plan."); *In re Hardacre*, 338 B.R. 718, 720 (Bankr. N.D. Tex 2006)("Among the abuses identified by Congress was the easy access to Chapter 7 liquidation proceedings by consumer debtors who, if required to file under Chapter 13, could afford to pay some dividend to their unsecured creditors.")(*citing* 151 Cong. Rec. S2459, 2469-70 (March 10, 2005)). "While the legislative purpose behind the modifications to section 707(b) is easy to discern, courts have struggled with its application." *In re Wilson*, 356 B.R. 114, 117 (Bankr. D. Del. 2006).

The pre-BAPCPA version of § 707 (b), contained in a single paragraph, was replaced in BAPCPA with seven complex sub-parts.

Subsections 707(b)(1)-(3) are germane to this matter.

## 2.    11 U.S.C. §707(b)(1)

Pre-BAPCPA § 707(b) was retained with significant alterations in § 707(b)(1).[6] Pre-BAPCPA § 707(b) only provided for dismissal of a Chapter 7 case, while § 707(b)(1) now provides for dismissal, or with the debtor's consent, conversion to a case under Chapter 11 or 13.  Standing to bring a motion to dismiss under pre-BAPCPA section 707(b) was explicitly denied to anyone but the United States Trustee or the court upon its own motion. Under BAPCPA, standing is now conferred upon any party in interest. The § 707(b) threshold for dismissal has been changed from "substantial abuse" under the pre-BAPCPA version of the statute to "abuse" under BAPCPA.

Newly added subsections 707(b)(2) and (3) now provide two methods for determining whether or not there is abuse under section 707(b)(1). *Singletary*, 354 B.R. at 459. Section 707(b)(2) requires debtors who seek bankruptcy relief to complete a  means test. There now exists a statutory presumption that the granting of Chapter 7

---

[6]    11 U.S.C. § 707 (b)(1)states:
After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, trustee (or bankruptcy administrator, if any), or any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter. In making a determination whether to dismiss a case under this section, the court may not take into consideration whether a debtor has made, or continues to make, charitable contributions (that meet the definition of "charitable contribution" under section 548(d)(3)) to any qualified religious or charitable entity or organization (as that term is defined in section 548(d)(4)).

relief to debtors who "fail" the means test would be abusive. Thus pre-BAPCPA § 707(b)'s "presumption in favor of granting the relief requested by the debtor" has been removed, and been replaced with post-BAPCPA § 707(b)(2)'s presumption of abuse against debtors who, as determined by the means test, have sufficient monthly disposable income to repay a portion of their unsecured debts. Section 707(b)(3) provides for dismissal in cases where the presumption of abuse under the means test does not arise or is rebutted.

## 2.    11 U.S.C. § 707(b)(2) - The Means Test

Section 707(b)(2)(A) provides for the means test and the presumption of abuse for debtors who "fail" the means test. The Statement of Current Monthly Income and Means Test Calculation (Official Form B22A) serves as a template for the means test calculations contained in § 707(b)(2)(A)(i)-(iv). The means test requires debtors to determine their CMI[7] which is the debtor's

---

[7] 11 U.S.C. § 101 (10A) states "current monthly income"--
(A) means the average monthly income from all sources that the debtor receives (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable income, derived during the 6-month period ending on--
        (i) the last day of the calendar month immediately preceding the date of the commencement of the case if the debtor files the schedule of current income required by section 521(a)(1)(B)(ii); or
        (ii) the date on which current income is determined by the court for purposes of this title if the debtor does not file the schedule of current income required by section 521(a)(1)(B)(ii); and
(B) includes any amount paid by any entity other than the debtor (or in a joint case the debtor and the debtor's spouse), on a regular basis for the household expenses of the debtor or the debtor's dependents (and in a joint case the debtor's spouse if not otherwise a dependent), but excludes benefits received under the Social Security Act, payments to victims of war crimes or crimes against humanity on account of their status as victims of such crimes, and payments to victims of international terrorism (as defined in section 2331 of title 18) or domestic terrorism (as defined in section 2331 of title 18) on account of their status as victims of such terrorism.

average monthly income received from all sources in the six month period ending on the last day of the calendar month preceding the commencement of the case. Thus, there is nothing "current" about CMI which by definition is an historical measure of average monthly income. The debtor's CMI must then be compared with the applicable median family income for similarly sized households within the debtor's state of residence. The distinction between the debtor's CMI being above or below the applicable median income is significant for debtors. If the debtor's CMI is below the applicable median family income, the debtor need not complete the remainder of the means test because there is no presumption of abuse for below median income debtors. If the debtor's income is above the applicable median family income, the debtor must complete the remainder of means test.[8]

The means test directs above median income debtors to calculate deductions to CMI using Internal Revenue Service ("IRS") national standards for similarly sized households for living expenses (food, clothing, personal care, household supplies), and IRS local standards for housing and utilities, mortgage/rent expense, and transportation expense. To these standard deductions

---

[8]The distinction between above and below median income is also significant in Chapter 13 cases because it determines the applicable plan period (36 - 60 months) and whether standard or actual expenses are to be used to determine disposable income available for plan payments. *See* 11 U.S.C. §§ 1322(d) and 1325(b)(3).

debtors may add other necessary expenses actually incurred for taxes, mandatory payroll expenses, life insurance, court-ordered payments, education expenses for employment or for a physically or mentally challenged child, childcare, healthcare, and tele-communication expenses.

The means test permits debtors to include additional expense deductions for amounts actually expended in several categories such as average monthly amounts actually expended for health insurance, continued contributions to the care of household or family members, disability insurance and health savings accounts, protection against family violence, home energy costs in excess of the specified IRS allowance, limited education expenses for dependent children under 18, additional food and clothing expense with documentation that such expense is reasonable and necessary, and continued charitable deductions.

The last part of the means test provides for deductions to CMI for future payments on secured claims, past due payments or cure amounts on secured claims for property that is necessary to the support of the debtor or the debtor's dependents, payments on priority claims such as alimony and child support, and Chapter 13 administrative expenses. The total of all deductions is subtracted from CMI to determine if a presumption of abuse arises. Such a presumption will arise --

13

> if the debtor's current monthly income reduced by the amounts determined under clauses (ii), (iii), and (iv), and multiplied by 60 is not less than the lesser of –
>
> > (I)  25 percent of the debtor's nonpriority unsecured claims in the case, or $6,000, whichever is greater; or
> > (II) $10,000.

11 U.S.C. § 707(b)(2)(A)(i). The debtor may rebut a presumption of abuse by demonstrating special circumstances such as a serious medical condition or a call to active duty in the Armed Forces that justifies additional expense or adjustments to CMI pursuant to § 707(b)(2)(B).

The means test is the embodiment of Congress' intent "that there be an easily applied formula for determining when the Court should *presume* that a debtor is abusing the system by filing a Chapter 7 petition." *In re Fowler*, 349 B.R. 414, 419 (Bankr. D. Del. 2006). The means test has been criticized as "a blind legislative formula that attempts to direct debtors to a Chapter that provides for at least some measure of repayment to unsecured creditors over a period of years. Like any other effort at social or economic legislation, it is not perfect." *In re Barraza,* 346 B.R. 724, 729 (Bankr. N.D. Tex. 2006). "The means test presents a backward looking litmus test performed using mathematical computations of arbitrary numbers, often having little to do with a particular debtor's actual circumstances and ability to pay a portion of debt. Congress has already determined the fairness of application of the means test, and a major objective of the

14

legislation was to remove judicial discretion from the process." *In re Hartwick*, 352 B.R. 867, 868 (Bankr. D. Minn. 2006). The Court notes that the means test's use of national and local standards rather than actual expenses, and historical rather than current actual income "was not intended to and does not produce the most accurate prediction of the debtor's ability to fund a Chapter 13 plan." *In re Walker*, 2006 WL 1314125 at *6 (Bankr. N.D. Ga. May 1, 2006). The purpose of the means test is to determine whether a presumption of abuse arises, however "a presumption is just that a presumption." *In re Lenton*, 2006 WL 3850011, at *6 (Bankr. E.D. Pa. Dec. 15, 2006). "Presumptions are typically created to avoid litigation." *Fowler*, 349 B.R. at 420. Thus, "whether the debtor passes or fails the means test is relevant only to the question of whether the U.S. Trustee will benefit from a presumption of abuse. In cases in which the presumption of abuse does not arise or is rebutted, the U.S. Trustee may pursue dismissal of a debtor's case under section 707(b)(3)." *In re Walker*, 2006 WL 1214125, at *8.

Thus while the presumption of abuse did not arise in this case, Debtors' passing the means test does not end the inquiry nor does it preclude a discretionary finding of abuse by the Court. *In re Simmons,* 2006 WL 3782959, at *7 (Bankr. N.D. Ohio Dec. 11, 2006); *Nockerts*, 2006 WL 3689465, at *8(Bankr. E.D. Wis. Dec. 14, 2006). BAPCPA provides a two-step process to detect and deter abusive filers: the above described objective means test prescribed in § 707

(b)(2), and the more subjective test of § 707 (b)(3) which requires an analysis of the facts of a particular case. *In re Hare*, 2007 WL 201249, at *3 (Bankr. E.D. Cal. Jan. 24, 2007); *In re Wilson*, 356 B.R. 114, 121 (Bankr. D. Del. 2006).

**3.    11 U.S.C. §707(b)(3) - What Circumstances are Embraced by the Totality of the Circumstances of the Debtors' Financial Situation?**

In cases where the presumption of abuse does not arise or is rebutted, section 707(b)(3) requires courts to consider whether the granting of relief would be an abuse of the provisions of Chapter 7 based upon the following criteria:

(A) whether the debtor filed the petition in bad faith; or

(B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

11 U.S.C. § 707(b)(3).

The UST's Motion, which is based upon § 707(b)(3), argues that the granting of relief would be an abuse of the provisions of Chapter 7 given the totality of the circumstances of the Debtors' financial situation.

Section 707(b)(3) incorporates the judicially constructed concepts of bad faith and totality of the circumstances. Therefore pre-BAPCPA case law applying these concepts can still be helpful in determining abuse under BAPCPA. *In re Mestermaker*, 2007 WL 79306, at  *5 (Bankr. N.D. Ohio Jan, 10, 2007); *In re Pak*, 343 B.R. 239,

243 (Bankr. N.D. Cal. 2006). Pre-BAPCPA, there was a split of authority among the circuits regarding what constituted "substantial abuse."[9] The First, Fourth, Sixth, Eight and Ninth Circuits used varying tests to determine the existence of "substantial abuse" pursuant to § 707(b). *In re Lamanna*, 153 F.3d 1, 4 (1st Cir. 1998). The First Circuit acknowledged that although the tests used by various courts of appeal did not employ precisely the same language, they shared common elements. *Id.* While a debtor's ability to pay was always a factor in a court's substantial abuse determination, the extent to which courts relied on the debtor's ability to pay varied. *In re DeGross*, 272 B.R. 309, 312 (Bankr. M.D. Fla. 2001).

The Sixth Circuit's test to determine § 707(b) substantial abuse, as stated in *Krohn*, directs courts to ascertain from the totality of the circumstances whether the debtor:

> is merely seeking an advantage over his creditors, or instead is 'honest,' in the sense that his relationship with his creditors has been marked by essentially honorable and undeceptive dealings, and whether he is 'needy' in the sense that his financial predicament warrants the discharge of his debts in exchange for liquidation of his assets. *Substantial abuse can be predicated upon either lack of honesty or want of need*.

*Krohn*, 886 F. 2d 123,126 (6th Cir. 1989) (emphasis added).

*Krohn* suggests that the factors relevant to a debtor's honesty include the debtor's good faith and candor in filing schedules, whether the debtor engaged in "eve of bankruptcy" purchases, and

---

[9]There are no pre-BAPCPA Eleventh Circuit opinions on this issue.

whether the debtor was forced into bankruptcy by unforeseen or catastrophic events. *Id*. The factors relevant to whether a debtor is needy include whether the debtor enjoyed a stable source of future income, whether the debtor was eligible for Chapter 13 relief, and whether his expenses could be reduced significantly without depriving him of necessities. *Id*. at 126-27. *Krohn* observed that courts would "not be justified in concluding that a debtor is needy and worthy of discharge, where his disposable income permits liquidation of his consumer debts with relative ease." *Id.* Thus *Krohn* attempted to separate the bad faith and ability to pay inquiries for determining the existence of substantial abuse that would warrant dismissal of a Chapter 7 case.

The First Circuit adopted the Sixth Circuit's formulation of the totality of circumstances test noting that the *Krohn* test demanded a "comprehensive review of the debtors current and potential financial history." *Lamanna*, 153 F. 3d at 4. The First Circuit found that ability to pay was the primary, but not conclusive, factor for determining substantial abuse. The First Circuit held that "a bankruptcy court may, but is not required to, find 'substantial abuse' if the debtor has an ability to repay, in light of all of the circumstances." *Id.* at 5. While rejecting "any per se rules mandating dismissal for 'substantial abuse' whenever the debtor is able to repay his debt out of future disposable income, or forbidding dismissal on that basis alone," the First

18

Circuit did not require courts to look beyond the debtor's ability to repay if that factor alone warranted dismissal. *Id.* at 2 and 4.

In *Kelly,* the Ninth Circuit determined that a finding of a debtor's ability to pay his debts standing alone justified § 707(b) dismissal for substantial abuse. *Zolg, v. Kelly (In re Kelly)*, 841 F. 2d 908, 914 (9th Cir. 1988). "This is not to say that inability to pay will shield a debtor from section 707(b) dismissal where bad faith is otherwise shown." *Id.* at 915. The Eighth Circuit subsequently agreed with the Ninth Circuit in *In re Walton,* 866 F.2d 981 (8th Cir. 1989). The Eighth Circuit rejected debtor's argument that "substantial abuse" must be equated with "bad faith," and in so doing reasoned that the debtor's "cramped interpretation of section 707(b) . . . would drastically reduce the bankruptcy courts' ability to dismiss cases filed by debtors who are not dishonest, but who also are not needy." *Id.* at 983. In concurring with *Kelly's* analysis and result, *Walton* "clearly contemplate[d] that the ability to fund a Chapter 13 plan can be sufficient reason to dismiss a Chapter 7 petition under § 707 (b)." *United States Trustee, v. Harris*, 960 F.2d 74, 76 (8th Cir. 1992). Thus, the Ninth Circuit's determination that ability to pay standing alone *is* sufficient cause for dismissal may be distinguished from the First, Sixth, and Eight Circuits' determination that ability to pay standing alone *can* be sufficient cause for dismissal.

In contrast, the Fourth Circuit determined that "solvency alone

is *not* a sufficient basis for a finding that the debtor has in fact substantially abused the provisions of Chapter 7." *In re Green*, 934 F.2d 568, 572 (4th Cir. 1991)(emphasis added). *Green* instructs courts to conduct substantial abuse determinations pursuant to a totality of the circumstances test that evaluates several factors including:

(1)  Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment;
(2)  Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;
(3)  Whether the debtor's proposed family budget is excessive or unreasonable;
(4)  Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition; and
(5)  Whether the petition was filed in good faith.

*Id.*

The *Green* court rejected *Kelly's* "per se" ruling that a debtor's ability to pay standing alone justifies dismissal of a Chapter 7 case for substantial abuse. *Id.* at 573. The *Green* court reasoned that such a *per se* rule would be inconsistent with the (pre-BAPCPA) § 707 (b) presumption in favor of granting the relief requested by the debtor. *Id.* In addition, *Green* determined that section 707 (b) "was intended to explicitly recognize the court's ability to dismiss a Chapter 7 petition for lack of good faith - when 'the total picture is abusive.'" *Id.* at 572.

Debtors' counsel urges the Court to follow *Green's* totality of the circumstances test and relies heavily on *In re Nockerts*, 2006

WL 3689465 (Bankr. E.D. Wis. Dec. 14, 2006), to argue that while an inquiry into ability to pay may be appropriate for below median income debtors who have not taken the means test, the inquiry under the "totality of the circumstances test" for debtors who have "passed" the means test requires something more than just ability to pay. To the extent that the ruling on the motion to dismiss in *Nockerts* was based upon §707(b)(2), *Nockerts* is not on point because in this case the UST's Motion is based upon § 707(b)(3). To the extent *Nockerts* invokes *Green* to hold that something more than ability to pay is required for dismissal under § 707 (b)(3)(B), the Court respectfully disagrees for the reasons discussed below.[10]

Notwithstanding the opinion of the *Nockerts* court, section 707(b) has been so extensively modified that the Court doubts *Green's* vitality post-BAPCPA. The presumption in favor of granting the relief requested by the debtor which *Green* sought to safeguard through its formulation of the totality of the circumstances test has been discarded by Congress in favor of a presumption of abuse for debtors who have the ability to pay their debts as determined by the means test. Thus, although *Green* rejected *Kelly's* per se

---

[10] The motion to dismiss in *Nockerts*, which was based upon §707(b)(2), presented the issue of whether the means test deduction for payments "scheduled as contractually due" should include payments for debt on property that debtors intended to surrender. *Nockerts*, 2006 WL 3689465 (Bankr. E.D. Wis. Dec. 14, 2006). The *Nockerts* court concluded that such payments were properly included in the means test calculation to determine if a presumption of abuse arises. The *Nockerts* court scheduled a further hearing to consider whether the case should be dismissed pursuant to § 707(b)(3) based upon the "totality of the circumstances".

ruling that ability to pay standing alone justifies dismissing a Chapter 7 case for substantial abuse, *Kelly's* per se rule has been codified in BAPCPA by § 707(b)(2)'s presumption of abuse for debtors, who "fail" the means test. Eugene R. Wedoff, *Means Testing in the New 707(b)*, 79 Am. Bankr. L.J. 231, 235 (Spring 2005); *Nockerts*, 2006 WL 3689465, at *7.

Despite the argument of Debtors' counsel, the Court does not find that *Green* provides guidance post-BAPCPA for analyzing the totality of the circumstances of debtor's financial situation under §707(b)(3).[11] The *Green* totality of the circumstances test requires consideration of factors that look at ability to pay *conjunctively* with bad faith. *Green's* inquiry into whether the petition was filed because of sudden illness, calamity, disability, or unemployment is relevant to the debtor's ability to repay creditors. However *Green's* inquiry into whether the petition was filed in good faith, by negative implication, determines whether bad faith exists. Thus, the *Green* factors consider ability to pay together with bad faith,

----

[11]The UST quotes a lengthy section of a December 7, 2000 Committee Report on bankruptcy reform legislation for its apparent approval of the court's decision in *Lamanna* and disapproval of *Green*. However, "[i]t is necessary to note that the history of the legislative efforts culminating in the 2005 Act is not the same as the legislative history of the 2005 Act. To the extent legislative history of the 2005 Act can be used to resolve any arguable ambiguity in the statutory language, it is of dubious assistance. First, there is no joint conference statement because the 2005 Act did not have a conference committee." *In re Sorrell*, 2007 WL 211276, at *7 (S.D. Ohio Jan, 26, 2007). *See also In re McNabb*, 326 B.R. 785, 789 (Bankr. D. Ariz. 2005) ("Legislative history is virtually useless as an aid to understanding the language and intent of BAPCPA.") The Court's interpretation of § 707 (b)(3) is based upon the plain meaning of the statute. The Court does not find it necessary to divine legislative intent from legislative history, at least not with respect to § 707(b)(3).

however BAPCPA requires a separate evaluation for bad faith and totality of the debtor's financial circumstances pursuant to subsections 707(b)(3)(A) and (B) respectively. "By listing 'bad faith' and 'totality of the circumstances' disjunctively, the statutory language [of § 707(b)(3)(A) and (B)]indicates that bad conduct by the debtor in connection with the bankruptcy is a ground for 707(b) relief independent of financial circumstances indicating that the debtor could repay debt." Wedoff, *Means Testing*, 79 Am. Bankr. L.J. at 236.

The Court notes that pre-BAPCPA substantial abuse cases speak generally of the "totality of the circumstances test". *See e.g. In re Lamanna,* 153 F.3d 1 (1st Cir. 1998); *In re Stewart*, 175 F.3d 796 (10th Cir. 1999). In contrast, post-BAPCPA § 707(b)(3)(B) specifically delineates the pertinent inquiry as the "totality of the circumstances *of the debtor's financial situation*". 11 U.S.C. §707 (b)(3)(B). Thus, the debtor's total financial situation as a measure of ability to pay, and bad faith are separate and sufficient grounds for dismissal. Either ability to pay *or* bad conduct in connection with the bankruptcy will warrant dismissal for abuse under § 707 (b)(3).

There has been no allegation of bad faith in this matter. The issue is whether the totality of the circumstances of the Debtors' financial situation indicates that Debtors have the ability to pay a substantial portion of their unsecured nonpriority debts. For the

reasons stated, the Court concludes that under BAPCPA the ability to pay, standing alone, is sufficient to warrant dismissal of a Chapter 7 case for abuse pursuant to 11 U.S.C. § 707(b)(3)(B).

## C.   *Does Totality of the Circumstances of Debtors' Financial Situation Include Consideration of Post-Petition Events?*

In this case Mrs. Henebury's commencing employment earning $39,000.00 per year just days after the Debtors filed for Chapter 7 relief significantly affects the Debtors' ability to pay creditors. Thus the issue for the Court is whether it is proper to consider the Debtors' post-petition financial situation in determining if the granting of relief would be an abuse of the provisions of Chapter 7. For the reasons stated below, the Court finds that the Debtors' post-petition financial situation is relevant and properly considered in the § 707(b)(3)(B) analysis.

## 1.   Cortez

The Fifth Circuit's pre-BAPCPA § 707(b) analysis of whether dismissal for substantial abuse permits consideration of post-petition events in *Cortez* was decided under factually similar circumstances to this matter. *United States Trustee, v. Cortez (In re Cortez)*, 457 F.3d 448 (5th Cir. 2006). Like Mrs. Henebury, the debtor in *Cortez* was unemployed on the petition date, but he commenced employment at an annual salary of $95,000.00 just two weeks after filing. In response to the Schedule I directive to disclose reasonably anticipated increases or decreases in income in

the coming twelve months, the debtor indicated that he expected to
be employed in the current month but had not started working as of
the petition date. *Id.* at 451. Based upon the debtor's new
employment and consequent ability to repay a substantial portion of
his unsecured debts, the United States Trustee moved for dismissal
for substantial abuse. In deciding *Cortez*, the Fifth Circuit relied
heavily on the language of § 707(b) to determine that substantial
abuse dismissal analyses may consider post-petition events. *Id.* at
455. The *Cortez* court first noted that "courts of appeals
considering § 707(b) have implicitly, if not explicitly, recognized
that 'granting of relief' means a Chapter 7 discharge." *Id.* The
Fifth Circuit's analysis then stated that § 707(b) 'does not
condition dismissal on the *filing* of bankruptcy being a 'substantial
abuse' but rather on the *granting of relief*, which suggests that in
determining whether to dismiss under § 707(b), a court may act on
the basis of any development occurring *before* the discharge is
granted." *Id.* (emphasis in original). In addition the Fifth Circuit
quoted the last sentence of § 707(b) which states: "[i]n making a
determination whether to dismiss a case under this section, the
court may not take into consideration whether a debtor has made, or
continues to make, charitable contributions ...". *Id.* The phrase
"or continues to make" suggested to the Fifth Circuit that with the
exception of charitable contributions, courts are "entitled to focus
on subsequent developments in the debtor's financial condition." *Id.*

The pre-BAPCPA § 707(b) language relied upon by the Fifth Circuit in *Cortez* has been retained in § 707(b)(1) and thus the holding of *Cortez* remains persuasive post-BAPCPA. There is also additional new forward-looking language in § 707(b)(3)(B) wherein courts are directed to consider whether:

> the totality of the circumstances (including *whether the debtor seeks to reject* a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

11 U.S.C. § 707(b)(3)(B)(emphasis added).

Although personal services contracts are not at issue in this matter, in cases where they are implicated section 707(b)(3)(B) *requires* courts to consider future events under the totality of the circumstances of the debtor's financial situation test for abuse. Thus the statutory language of post-BAPCPA § 707(b)(1) and (3) adds further support to *Cortez*' conclusion that courts can consider post-petition events occurring prior to discharge in making dismissal for abuse determinations.

The Fifth Circuit's analysis continued by noting that other circuit courts had not considered the propriety of considering post-petition events for substantial abuse determinations. 457 F.3d at 456. Nevertheless, the Fifth Circuit found support for its conclusion in the other courts agreement "that a debtor's ability to repay his debts out of *future* income is a primary factor to be considered in determining whether to dismiss for substantial abuse." *Id*. (emphasis added); *see also Walton*, 866 F. 2d at 984. The *Cortez*

26

court stated that "[i]f sufficient income to fund a Chapter 13 plan is _anticipated_, a complete discharge of the debtor's obligations would constitute a substantial abuse of Chapter 7." 457 F.3d at 457 (emphasis added). The Fifth Circuit found additional support for its forward-looking analysis in a Chapter 13 debtor's obligation to amend their schedules to include subsequent income even if that income was not known or realized at the time of the filing. _Id._ Thus while post-petition earnings are not property of the estate, the Fifth Circuit determined that courts "can and should take them into account for purposes of determining substantial abuse under § 707(b)." _Id._ at 458. The _Cortez_ case was remanded to the bankruptcy court for consideration of any post-petition events affecting the debtor's financial situation including any post-petition changes in income.

The Fifth Circuit's reasoning in _Cortez_ continues to provide guidance post-BAPCPA.[12] The statutory language relied upon in _Cortez_ is unchanged. If anything, BAPCPA's statutory modifications render it easier for a movant to establish abuse. _Lenton_, 2006 WL 385001,

---

[12] The effect of _Cortez_ post-BAPCPA has been debated. _See_ John H. Dion, _Timing is Everything...Or Is It?_ 25-Oct Am Bankr. Inst. J. 1 (2006)(suggesting that _Cortez_ is relevant and important post-BAPCPA. The decision is statutorily well-reasoned despite the outcome being contrary to most practitioner's concepts of Chapter 7 timing and planning); _but cf._ Rafael I. Pardo, _Analyzing Chapter 7 Abuse Dismissal Motions Post-BAPCPA: A Reply on Cortez,_ 25-Jan Am. Bankr. Inst. J. 16 (suggesting that the statutory definition of current monthly income being historical virtually eliminates _Cortez_-style judicial discretion to consider post-petition income fluctuations in abuse dismissal motions based on the means test. Only when the presumption of abuse does not arise or is rebutted will courts have a meaningful opportunity to evaluate the effect of a post-petition increase in a debtor's income).

at *11 (Bankr. E.D. Pa. Dec. 15, 2006). The threshold for dismissal has been lowered to "abuse" from "substantial abuse", and the pre-BAPCPA presumption in favor of granting the relief requested by the debtor has been eliminated in favor of a presumption of abuse for debtors who have an ability to pay a portion of their debts pursuant to the means test.

**2.   Post-BAPCPA cases**

Post-BAPCPA, other bankruptcy courts have held that abuse determinations pursuant to the totality of the circumstances of the debtor's financial situation requires analysis of a debtor's actual ability to pay and therefore post-petition events are properly considered under § 707(b)(3)(B). *In re Lenton*, 2006 WL 3850011 (Bankr. E.D. Pa. Dec. 15, 2006)(*citing, In re Richie,* 353 B.R. 569 (Bankr. E.D. Wis.  2006); *In re Paret*, 347 B.R. 12 (Bankr. D. Del. 2006); *In re Pak*, 343 B.R. 239 (Bankr. N.D. Cal. 2006)).

In *In re Pennington*, 348 B.R. 647 (Bankr. D. Del. 2006) the issue was framed by the court as: "whether the Court, in considering the 'totality of the circumstances ... of the debtor's financial situation' is limited to the Debtor's financial situation as of the date of the filing of the petition or may/must consider the Debtor's financial situation at the time the motion to dismiss is heard." *Id.* at 651. In *Pennington*, the United States Trustee filed a motion to dismiss for abuse because the debtor was funding a savings account through payroll deductions of $430.00 per month. In addition, the

28

debtor's schedules reflected $91.00 in additional net monthly income that could be used to pay creditors. Prior to the hearing on the motion to dismiss, the debtor filed an amended Schedule J reflecting increased car expenses of $557.00 per month. However, the debtor testified that $557.00 was not his actual car expense because he surrendered the car post-petition and bought a less expensive model. *Id.* at 648.

In granting the United States Trustee's motion, the *Pennington* court reasoned that:

> [a] ruling that the Court may only consider the Debtor's financial situation at the time of the filing would cut both ways. If a debtor incurred additional expenses post-petition (for example, he needed a new car or had additional unexpected medical expenses), the Court would not be able to consider it. Such an arbitrary rule is not mandated by the language of the Code, nor does it appear to be reasonable."

*Id.* at 651.

The *Pennington* court found that the very broad language of §707(b)(3) "was meant to give courts considerable leeway to consider all aspects of the debtor's financial situation." *Id.* In rejecting debtor's argument that the court's analysis should be limited to the financial situation as of the petition filing date, the *Pennington* court noted that, "[t]here is no indication in the language of the statute or the legislative history that Congress meant to limit temporally the Court's consideration of the Debtors' financial condition when determining whether to dismiss a case for abuse." *Id.* The court concluded that it must consider the debtor's financial

situation "at the time of the hearing on the motion to dismiss in determining whether granting Chapter 7 relief is an abuse under section 707(b)(3)." *Id.* *Pennington's* conclusion is also consistent with cases holding that courts must consider the debtor's future, rather than historical, income and expenses when determining confirmation of a Chapter 13 plan. *Id.* at 651 (*citing In re Demonica*, 345 B.R. 895, 900 (Bankr. N.D. Ill. 2006); *In re McGuire*, 342 B.R. 608, 614 (Bankr. W.D. Mo. 2006); *In re Jass*, 340 B.R. 411 (Bankr. D. Utah 2006); *In re Hardacre*, 338 B.R. 718, 722 (Bankr. N.D. Tex. 2006)).

The *Pak* court also found that the totality of the circumstances of the debtor's financial situation required the court to consider whether the debtor had the ability to pay unsecured claims through a hypothetical Chapter 13 plan. *In re Pak,* 343 B.R. 239, 246 (Bankr. N.D. Cal. 2006). The *Pak* court reasoned that a debtor's

> actual and anticipated future income must be considered, rather than simply his [historical] 'current monthly income,' in determining . . . 'projected disposable income' for purposes of confirming a chapter 13 plan. Thus, this is also the correct income figure to use in deciding whether to grant or deny a motion to dismiss a chapter 7 case under section 707(b)(3)(B).

*Id*. at 245-46. Thus, the *Pak* court found it proper to include post-filing changes in circumstances such as increased or decreased income in its dismissal for abuse analysis.

The *Richie* court, relying upon *Pennington* and *Pak*, similarly determined that if a debtor's ability to repay creditors is

30

different at the time of filing and at the time of the hearing on the motion to dismiss, the ability to pay analysis is properly conducted based upon the debtor's financial circumstances existing at the time of the hearing on the motion to dismiss, not the petition date. *In re Richie*, 353 B.R. 569, 575-76 (Bankr. E.D. Wis. 2006).

In *In re Hare*, 2007 WL 201249 (Bankr. E.D. Cal. Jan. 24, 2007) the above median income debtors had "passed" the means test because they claimed a large deduction for contractual mortgage payments due on a residence that was effectively surrendered in bankruptcy. *Id.* at *1. The court granted the United States Trustee's motion to dismiss for abuse because the debtors had the actual ability to pay a substantial portion of their debts through a Chapter 13 plan. *Id.* at *4. In addition, the court considered the debtors' attempt "to claim a substantial Means Test deduction for a mortgage payment which they never intended to pay, and which in fact ceased to exist after they filed for bankruptcy protection, . . . a further 'circumstance' . . . suggest[ing] that a Chapter 7 discharge would be an abuse." *Id.*

The *Lenton* court determined that it's § 707(b)(3) abuse analysis required the court to consider the debtor's "actual and anticipated financial situation over the applicable Chapter 13 commitment period." *Lenton*, 2006 WL 3850011, at *10 (Bankr. E.D. Pa. Dec. 15, 2006). Thus, the *Lenton* court's analysis was also

forward-looking.

This Court agrees with the reasoning in the cases discussed above. In determining if the granting of relief would be an abuse of the provisions of Chapter 7, courts are required to determine if the debtor has the ability to pay a substantial portion of their unsecured claims through a Chapter 13 plan based upon the totality of the debtor's financial circumstances. If a Chapter 13 plan is to be feasible it must be based on the debtor's actual or anticipated ability to pay and therefore consideration of post-petition changes in the financial circumstances of the debtor is appropriate. *See, e.g., In re Edmunds*, 350 B.R. 636, 647 n. 16 (Bankr. D.S.C. 2006).

### 3.   What determines ability to pay for an above median income debtor?

Having determined that courts pre- and post-BAPCPA generally determine ability to pay by analyzing whether the debtor has sufficient projected disposable income to fund a hypothetical Chapter 13 case, *see, e.g., In re Jones*, 335 B.R. 206, 208 (Bankr. M.D. Fla. 2005); *In re Richie*, 353 B.R. 569, 575 (Bankr. E.D. Wis. 2006), the issue post-BAPCPA is how to calculate ability to pay for the above median income Debtors in this case. While the purpose and outcome of an objection to confirmation and a motion to dismiss a Chapter 7 case for abuse are materially different, Chapter 13 cases are instructive. *Zak,* 2007 WL 143065, at *6 (Bankr. N.D. Ohio Jan. 12, 2007). "[A] Chapter 13 case is prospective, i.e., it encompasses a debtor's current and future financial circumstances for a period

of three to five years." *Lenton*, 2006 WL 3850011, at *6. "Section 1325(b)(1)(B) requires Debtors to use all of their 'projected disposable income' to pay unsecured creditors during the applicable commitment period" of a Chapter 13 plan. *In re Edmunds*, 350 B.R. 636, 640 (D.S.C. 2006). Post-BAPCPA, the expense amounts used to calculate projected disposable income for below median income debtors continues to be determined by examining Schedule J, however the calculation of applicable expenses for above median income debtors highlights the odd manner in which BAPCPA has been drafted. While "projected disposable income" is not defined, "disposable income" is a defined term under BAPCPA. "'Disposable income," for above median income debtors is defined as 'current monthly income,' also a defined term . . . less amounts reasonably necessary 'to be expended' as determined by § 707(b)(2)(A)&(B)." *Id.* (paraphrasing § 1325(b)(3)). As previously noted, current monthly income is based upon historical average monthly income over a six month period prior to the filing of the bankruptcy. Section § 1325(b)(3) now directs above median income debtors to calculate expense deductions to CMI based upon the means test formula found in § 707(b)(2)(A) and (B). *In re Miller*, 2007 WL 128790, at *3 (Bankr. N.D. Ala. Jan. 18, 2007). Under the means test formula, above median income debtor's applicable monthly expense amounts are based upon IRS national and local standards plus the debtor's actual monthly expenses for certain other categories. *Id.* Thus for purposes of Chapter 13 plan

confirmation, above median income debtors calculate their disposable income by using an historical average for income, that may or may not reflect the debtor's current income, from which standard amounts rather than actual amounts are deducted for several categories of expenses. How this seeming anomaly is to be harmonized with the requirement that debtors use all of their projected disposable income to pay unsecured creditors has led to different opinions by different courts in interpreting the calculation and use of "projected disposable income" versus "disposable income" for above median income debtors in Chapter 13 cases.[13] Since the Court is not actually adjudicating Debtor's projected disposable income in the context of a confirmation hearing, these issues while instructive

---

[13]The Miller court categorized the varying bankruptcy court decisions. "One line of cases holds that post-BAPCPA, Schedule J is irrelevant to the determinations of disposable income for above median income debtors." *In re Miller,* 2007 WL 128790, at *4 (Bankr. N.D. Ala. Jan. 18, 2007)(*citing In re Farrar-Johnson*, 353 B.R. 224 (Bankr. N.D. Ill. 2006); *In re Alexander*, 344 B.R. 742 (Bankr. E.D.N.C. 2006); *In re Barr*, 341 B.R. 181 (Bankr. M.D.N.C. 2006); *In re Guzman*, 345 B.R. 640 (Bankr. E.D. Wis. 2006);*In re Hanks*, 2007 WL 60812 (Bankr. D. Utah 2007)). "Other courts have turned to Schedules I and J finding that the terms 'projected disposable income' as used in §1325(b)(1)(B) and 'disposable income' as used in § 1325(b)(2) are not synonymous. Because Congress added the word 'projected' to § 1325(b)(1)(B) which is a forward looking concept, some courts hold that the expense component of 'projected disposable income' must necessarily be a forward looking reflection of the debtor's projected expenses allowed by the means test." *Id.* "Other courts suggest that the concept of good faith under §1325(a)(3) demands a review of the debtor's actual income and expenses." *Id.* (*citing In re Edmunds*, 350 B.R. 636 (Bankr. D.S.C. 2006); *In re Kibbe*, 342 B.R. 411 (Bankr. D.N.H. 2006)). "Another line of cases has focused upon the issue of whether debtors are entitled to deduct from disposable income payments on secured debts for which the debtors will not actually be liable as a result of their decision to surrender the collateral securing the debt." *Id.* at 5 (*citing In re Love*, 350 B.R. 611 (Bankr. M.D. Ala. 2006); *In re Crittendon*, 2006 WL 2547102 (Bankr. M.D.N.C. 2006); *In re Hardacre*, 338 B.R. 718 (Bankr. N.D. Tex. 2006);*In re Oliver*, 2006 WL 2086691 (Bankr. D. Or. 2006); *In re Grunert*, 353 B.R. 591 (Bankr. E.D. Wis. 2006); *In re Haley*, 2006 WL 2987947 (Bankr. D.N.H. 2006)). The foregoing cases suggest several issues that could arise if this were an objection to Chapter 13 confirmation proceeding.

need not be decided here.

Having determined in this matter that the totality of the circumstances of the Debtor's financial situation is concerned with Debtor's actual ability to pay some, if not all, of Debtor's unsecured nonpriority debt through a hypothetical Chapter 13 plan and that post-petition events are relevant to, and properly considered, the Court finds it appropriate to begin its analysis with the Debtors' Means Test which should reflect Debtors' applicable expenses using the IRS national and local standards described in section 707(b)(2)(A).[14] From this starting point adjustments may be necessary based on the Debtors' actual financial circumstances. *See e.g., Singletary*, 354 B.R. 455, 462 n.6 (S.D. Tex. 2006)(If "the UST elects to file a motion under § 707(b)(3), the UST may include a means test calculation based on the circumstances on the date of the filing of the motion or any date in the future. In that case, the court would be able to consider this means test as relevant evidence under the totality of circumstances analysis of § 707(b)(3). . . ."). In determining if the granting of relief would be an abuse of the provisions of Chapter 7 based upon the totality of the Debtors' financial situation, the Court finds it

---

[14]The required use of standard applicable expenses for calculating disposable income sets spending limits on above median income debtors. *See Fuller*, 346 B.R. 472, 484 (Bankr. S.D. Ill. 2006) (In "attempting to avoid a scenario in which an above median-income debtor could reduce his disposable income by claiming what Congress might consider to be unreasonably high expenses" such debtors are told how much they can spend each month for food, clothing and housing.)

appropriate and equitable to include Mrs. Henebury's income from the teaching job she started just four days after Debtors filed their petition. If the Court adds Mrs. Henebury's net monthly income of $2,875.00 to Debtors' CMI as listed on their Means Test, the Debtors' monthly disposable income would be $1,746.93 rather than negative $1,128.07. This amount would allow the Debtors to repay 100% of their $73,799.46 unsecured debt in less than 43 months.

Alternatively, if the Court bases its analysis on Debtors' filed Schedules but adds Mrs. Henebury's net monthly income of $2,875.00 to Debtors' Schedule I and deducts the expenses listed on Debtors' Schedule J, Debtors' monthly disposable income would be $2,298.14 rather than negative $576.86. This amount would allow Debtors to repay 100% of their $73,799.46 in unsecured debt in less than 33 months.

Even using a third calculation based upon the Proposed Revised Schedules that Debtors' counsel introduced as evidence of Debtors inability to repay creditors, the Debtors would have sufficient disposable monthly income to repay unsecured creditors. The Proposed Revised Schedules included Mrs. Henebury's income but also included substantially greater expenses than the amount listed on Debtors' filed Schedule J. The UST objected on the basis that Debtors are not making all of the payments listed on Proposed Revised Schedule J. For example, Debtors ceased making mortgage payments of $2,403.97 for the Lake Worth Property prior to the petition date and Mr.

Henebury testified that the family no longer resides there. Debtors now reside instead in a rental property in Port Orange that costs $1,550.00 per month. The Court does not find that it is proper to include the expenses associated with two residences in a calculation to determine whether Debtors have the ability to repay their creditors. The cost of two residences is neither necessary to be expended for the support of the Debtors, nor is it reasonable. Debtors also included payments for the Timeshare, a debt for which the Court subsequently denied reaffirmation. If the Court uses Debtors' Proposed Revised Schedules but eliminates the duplicated housing cost of $2,403.97 for the Lake Worth monthly mortgage payment and the Timeshare payment of $252.56, Debtors Proposed Schedule J expense would equal $6,383.13. Debtors monthly disposable income pursuant to Debtors' Proposed Revised Schedules without these expenses would be $1,328.75, rather than negative $1,327.78 as listed. This amount of monthly disposable income would be sufficient to repay 100% of Debtors' $73,799.46 in unsecured debt in less than 56 months.

Debtors' counsel argues that Debtors have neither abandoned nor surrendered the Lake Worth Property and that this contractually due payment should be considered. However the "contractually due" payments standard applies to Means Test calculations that determine whether the presumption of abuse arises. The presumption of abuse calculations are not entirely relevant to the Debtors' actual

37

current and prospective financial situation. Moreover, there is a
distinction between the objective presumption of abuse analysis
under § 707(b)(2) which excludes judicial discretion, and the
subjective dismissal for abuse analysis under § 707(b)(3)(B) which
permits the Court's "case-by-case analysis . . . to address what
Congress expected would be the inevitable exceptional cases."
*Wilson*, 356 B.R. at 121. Having not made payments for the Lake Worth
Property since June, Debtors have effectively, if not formally,
surrendered the Lake Worth Property. Inclusion of these payments
distorts Debtor's actual current and prospective financial
situation. The Court also notes that in the context of Chapter 13,
which has become a de facto test for Chapter 7 dismissal for abuse
based upon a debtor's ability to pay, when a debtor proposes a plan
for confirmation

> the terms of the plan determine whether payments have been
> scheduled for payment in the future and also establishes the
> classification of creditors on the effective date of the plan.
> The confirmed chapter 13 plan constitutes a new agreement
> between the debtor and the creditors and is controlling as to
> the payments to be made to creditors, as well as to which of
> the creditors are secured creditors.

*Crittendon*, 2006 WL 2547102, at *4 (Bankr. M.D.N.C. Sept. 1, 2006).

The Court recognizes that this is not a Chapter 13 confirmation
proceeding. However since a confirmable plan would not include costs
for two residences, the inclusion of costs for two residences is not
proper in an analysis that looks to see if Debtors have the ability
to repay a substantial portion of their unsecured creditors based

upon Debtors' ability to fund a hypothetical Chapter 13 plan.

Debtors have been shown to have sufficient disposable monthly income to pay most, if not all, of their unsecured nonpriority debt pursuant to three different calculations. Under the totality of these financial circumstances the entry of a Chapter 7 discharge would be an abuse. Having determined the existence of abuse, the Court need not address the other expenses that the UST alleges are overstated. The Court notes that there have been no allegations of bad faith and there is nothing in Debtors' lifestyle that suggests they have lived extravagantly or been reckless in dealing with their finances. Nevertheless, Debtors do have an ability to repay a substantial portion of their unsecured debt and therefore the granting of Chapter 7 relief is unwarranted.

## **CONCLUSION**

There has been no allegation of bad faith in this matter. While the Debtors filing for Chapter 7 protection only four days before Mrs. Henebury became employed may have been an opportunistic filing, it was not illegal. However the Court is compelled to review the totality of the Debtors' financial circumstances, and for the reasons stated, the Court finds that the Debtors have the ability to repay a substantial portion of their unsecured debt. Therefore pursuant to 11 U.S.C. § 707(b)(3)(B), the granting of a Chapter 7 discharge in this case would be an abuse of the provisions of Chapter 7.

39

## ORDER

The Court, having heard the argument of counsel, considered the testimony and evidence presented, reviewed the applicable law, and being otherwise fully advised in the premises does hereby:

**ORDER AND ADJUDGE** that the UST's Motion is **GRANTED.** The above-captioned case shall be dismissed within ten days following entry of this Order unless Debtors move to convert this case to one under Chapter 13 with said ten days.

### 

Copies Furnished:

Debtors' Counsel
AUST

The Clerk of the Court is directed to serve a copy of this Order on all interested parties not listed above.

40